UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:10-00283 |
| | ) | JUDGE CAMPBELL |
| DONSHAY L. FALLS | ) | |

MEMORANDUM AND ORDER

I. Introduction

Pending before the Court is the Defendant's Motion To Suppress (Docket No. 15). The Court held a hearing on the Motion on May 18, 2011. The parties have filed post-hearing briefs on the issues raised at the hearing. (Docket Nos. 29, 30). For the reasons set forth below, the Motion is DENIED.

II. Factual and Procedural Background

At the suppression hearing, the Government called two witnesses from the Metropolitan Nashville-Davidson County Police Department: Donald Kahn and Michael Neumeyer.

Officer Kahn testified that while on patrol on the evening of May 22, 2010, he was dispatched to a dead end cul-de-sac on Charlie Place in Nashville, Tennessee. (Transcript of Suppression Hearing held on May 19, 2011, at 4-6 (Docket No. 25)). The dispatcher information was that several individuals were "clicking" weapons in the area, and the caller believed they were possibly going to shoot the weapons. (Id., at 6). According to Officer Kahn, this type of "persons with weapons" call is a serious one, characterized as a "Code 3 emergency." (Id.) Officer Kahn testified that the Charlie Place address was located in North Nashville, and was in a high crime residential area where gangs were active. (Id.)

Officer Kahn testified that he and two other officers, in separate patrol cars, arrived at the location at around midnight. (Id., at 7). The cul-de-sac was lit by a street light, but the houses themselves were fairly dark, according to Officer Kahn. (Id.) Officer Kahn testified that he was in uniform and in a marked car, but the officers approached the cul-de-sac with their car lights off. (Id.) Upon his approach, Officer Kahn testified, he saw the Defendant, alone, standing at the end of the cul-de-sac. (Id., at 7-8).

Officer Kahn testified that he pulled into the cul-de-sac and put his car in park. (Id., at 8). At that time, Officer Kahn testified that he saw the Defendant put his hands in his pockets and start walking across the cul-de-sac. (Id.) Officer Kahn said that he walked around the back of his car for safety, and engaged the Defendant in conversation. (Id., at 8-9). Officer Kahn testified that he addressed the Defendant, saying: "Hey, how you doing? Do you live around here?" – or words to that effect. (Id., at 9). According to Officer Kahn, the Defendant replied: "Yeah, I live over here," and pointed to one of the residences. (Id.) Officer Kahn testified that the Defendant was not walking in the direction he indicated, and did not appear to be walking directly to any residence. (Id.) Officer Kahn testified that he asked the Defendant if he had any weapons on him, and the Defendant said he did not. (Id.) Officer Kahn testified that he told the Defendant the police had received a call about people with weapons, and asked the Defendant if he minded his patting him down for weapons. (Id.) According to Officer Kahn, the Defendant said: "No, go ahead." (Id., at 10). Officer Kahn testified that he patted the Defendant down and found a loaded Cobra .380 in the Defendant's waistband. (Id.)

Officer Kahn said that he never told the Defendant he could not leave, nor did he accuse him of committing any crime. (Id., at 10-11). Officer Kahn testified that the Defendant was

cooperative, and did not indicate that he did not want to speak. (Id., at 11). According to Officer Kahn, the conversation with the Defendant, prior to the pat-down, lasted one to two minutes. (Id.)

Officer Kahn testified that after he found the firearm, he asked the Defendant if he was a felon, and the Defendant answered in the affirmative. (Id.,at 12). At that point, Officer Kahn said that he put the Defendant in handcuffs, and conducted a more thorough search. (Id., at 12-13). Officer Kahn testified that he found marijuana in the Defendants's left pocket in a small baggie, placed inside a larger baggie. (Id., at 13). According to Officer Kahn, the marijuana weighed 17-19 grams. (Id.)

Officer Kahn testified that he put the Defendant in the back of his car, and read Miranda rights to him from a card he keeps for that purpose. (Id.) According to Officer Kahn, the Defendant said that he understood his rights. (Id., at 13-14). Officer Kahn testified that he then asked the Defendant questions about the gun in order to prepare for completing the gun questionnaire. (Id., at 14). Officer Kahn said the Defendant told him he had just obtained the gun, and would not say where he obtained it. (Id.)

Officer Kahn said that he then drove the Defendant to booking, which took approximately 15 minutes. (Id.) At booking, while still in the car, Officer Kahn testified, he reminded the Defendant of his Miranda rights, and the Defendant cooperated in filling out the gun questionnaire. (Id., at 14-16). Officer Kahn testified that in filling out the form, the Defendant did not say where he obtained the gun, because, he said, he did not want to get that person in trouble. (Id., at 16). Officer Kahn testified that the Defendant also said, in filling out the form, that he had the gun for protection, was currently on probation, and was a marijuana and

cocaine user. (Id.) Officer Kahn said that the Defendant also told him that he had smoked marijuana earlier in the evening and had forgotten that it was in his pocket. (Id., at 16-17). Officer Kahn testified that the Defendant did not appear to be impaired. (Id.)

On cross examination, upon consulting dispatch logs, Officer Kahn testified that it took approximately nine minutes from the time the call was dispatched until he arrived at the scene. (Id., at 17-20). Officer Kahn testified that he and Officer Neumeyer met on Garrison Street prior to traveling to the scene to coordinate their approach. (Id., at 20-21). He explained that the officers approached with their car lights off to maintain an element of surprise. (Id., at 21). Officer Kahn testified that he was the lead car during the approach, that he was not driving fast when he entered the cul-de-sac, and that Officer Neumeyer parked behind him. (Id., at 21-23). At some point, Officer Kahn testified, Officer Davis arrived. (Id., at 31-32).

Officer Kahn said he did not see the Defendant doing anything illegal when he first observed him. (Id., at 25-27). At that point, Officer Kahn testified, the Defendant started walking on the street from his left to his right in front of the patrol car, and that he did not order the Defendant to stop. (Id., at 28-29). Officer Kahn stated that he did not have his hand on his gun, and that the gun was in a holster secured with a strap. (Id., at 29-30). According to Officer Kahn, the Defendant was between five and ten feet away from him when he asked to do a pat-down. (Id., at 41). Officer Kahn testified that Officer Neumeyer was behind him, and later, to his side. (Id., at 38-43). Officer Kahn estimated the time from when he first got out of his patrol car and the time he found the gun on the Defendant to be approximately two minutes. (Id., at 44).

Officer Kahn testified that after the Defendant was arrested and placed in his car, a

4

female resident came on the scene and refused to show her identification when asked. (Id., at 35-39). Officer Kahn testified that she was argumentative, and that he had a debate with her. (Id.)

Officer Neumeyer testified that he was dispatched to a cul-de-sac, but could not recall the name, at around 11:00 p.m. on May 22, 1010, based on a complaint of males clicking guns and possibly dealing drugs. (Id., at 45-46). According to Officer Neumeyer, Officers Kahn and Davis also responded to the call, and his car was the first or second to enter the cul-de-sac. (Id., at 47). Officer Neumeyer testified that he observed the Defendant on the street, walking briskly away and looking nervous. (Id.) Officer Neumeyer testified that he asked the Defendant to stop and talk, and then, Officer Kahn started the conversation with the Defendant. (Id., at 48). According to Officer Neumeyer, he asked Officer Davis to speak with another male individual at the scene so that Officer Neumeyer could stay with Officer Kahn as he talked with the Defendant. (Id.) Officer Neumeyer then heard Officer Kahn ask the Defendant if he had guns or drugs on him, and the Defendant said no. (Id.) Then, Officer Kahn asked the Defendant for permission to pat down or search him, and the Defendant agreed. (Id., at 48-49). Officer Neumeyer testified that during the pat-down of the Defendant, Officer Kahn found a loaded, semiautomatic weapon, and he, Officer Neumeyer, retrieved it. (Id.)

Officer Neumeyer testified that when he first approached the Defendant, he did not tell him that he had to stay, nor did he accuse him, raise his voice, touch him or display his weapon. (Id., at 49-50). Officer Neumeyer said the Defendant was extremely cooperative. (Id., at 50). According to Officer Neumeyer, thirty seconds to one minute elapsed between the time he got out of his car and the time the weapon was discovered on the Defendant. (Id., at 50-51).

On cross examination, Officer Neumeyer testified that he was the first car to arrive in the

5

area, and that he and Officer Davis and Officer Kahn met on Garrison Street before they went to the scene. (Id., at 52). Officer Neumeyer could not recall if the officers had their headlights on or off. (Id., at 53). Officer Neumeyer also could not recall whether his car was the first or second to enter the cul-de-sac. (Id., at 53).

According to Officer Neumeyer, he was the first officer to encounter the Defendant. (Id., at 54). He testified that he thought the Defendant might run because he was walking quickly, and appeared to be nervous. (Id.) Officer Neumeyer testified that upon approaching the Defendant, he said: "Hey, come here. . . Can I talk to you?" – or words to that effect. (Id., at 55). When asked if he ordered the Defendant over to him, Officer Neumeyer answered affirmatively. (Id., at 56). Officer Neumeyer testified that he and Officer Kahn approached the Defendant at roughly the same time, and Officer Kahn took over the encounter, while Officer Neumeyer stood by as cover to protect Officer Kahn. (Id., at 57). Officer Neumeyer stated that he was five feet or so behind Officer Kahn observing the encounter, but did not have his hand on his firearm. (Id.) He testified that he observed Officer Kahn ask the Defendant if he would agree to a pat-down. (Id., at 58). During this time, Officer Neumeyer testified, Officer Davis was talking to another black male who was on the scene. (Id., at 59).

The Defendant called three witnesses to testify at the hearing: Toni Monget, Brian Carter and himself.

Ms. Monget testified that she lived at 822 Charlie Place on May 22, 2010, and that the Defendant was her neighbor. (Id., at 63). On that night, Ms. Monget testified, she was lying down, and when she got up and looked outside, she saw police lights. (Id., at 64). When she went out to investigate, she saw the Defendant with the police, standing next to a police car. (Id., at

6

65-66). Ms. Monget testified that the Defendant saw her and asked her to go get his girlfriend. (Id., at 66). As she started walking toward the Defendant's house, Ms. Monget testified, she was stopped by an officer who told her not to go to the Defendant's house, told her to come over to him, and asked her name. (Id., at 66-68). Ms. Monget said the officer was very rude. (Id., at 67). She said the officer told her he was responding to a call of men with guns. (Id.) According to Ms. Monget, the officer called her a "smart ass" when she refused to give him her name. (Id., at 68). She said the officer told her to return to her house, and she did. (Id.)

On cross examination, Ms. Monget testified that there were a lot of people standing around when she went outside that night. (Id., at 70). She said she did not observe what happened when the Defendant first encountered the police, and did not hear any questions the police may have asked the Defendant. (Id., at 70-71).

The Defendant testified that on May 22, 2010, he lived with his girlfriend, Bria, at 825 Charlie Place, which is on the left side of the cul-de-sac. (Id., at 71-72). At 11:06 p.m., the Defendant said, he left the house, stood on the porch, and started walking across the street to Eugene's house, to borrow a cigarette. (Id., at 72-74). As he was going across the street, the Defendant testified, he heard police cars accelerating the gas. (Id., at 74). The Defendant testified that the cars made a screeching sound when they stopped, and at that point, he turned around and saw two police cars with blue lights and headlights turned off. (Id., at 75).

The Defendant said he kept on walking, and he heard one officer say: "Hey, Hey." (Id., at 76). The Defendant said he kept on walking and the officer said: "Hey, come here. Stop." (Id.) At that point, according to the Defendant he stopped, and one of the officers approached him. (Id.) The Defendant testified that the officer asked him if he had a gun on him, and the

7

Defendant answered "no." (Id.) The officer then asked if he lived around there, and the Defendant answered: "Yeah, I live across the street." (Id.) The Defendant said that he pointed across the street. (Id.) The Defendant testified that the officers then approached him and asked if he had any guns on him. (Id.) According to the Defendant, he said "no," and raised his shirt. (Id.) The Defendant testified that, at that point, one of the officers started searching him, saying: "You sure you don't have no guns?" (Id.) By that time, the Defendant said, the officer had patted him down and found a gun. (Id.) The Defendant testified that one officer was behind him and one was at his side. (Id., at 77). While they were talking to him, the Defendant said, the officers were touching their guns. (Id.) The Defendant testified that the officers never asked if they could search him. (Id.)

The Defendant testified that when the officer found the gun, he roughly pushed him in front of the car, and asked if he had anything else on him. (Id., at 77-78). While he was asking that question, the Defendant said, he was also handcuffing him. (Id., at 78). The Defendant testified that he told the officer he didn't have anything else on him. (Id.) At that point, the Defendant said, the officer searched his pocket and found "the weed." (Id.) The Defendant testified that the officer said: "I thought you said you didn't have nothing else on you." (Id.) The Defendant testified that the officer "kind of roughed me up." (Id.)

The Defendant testified that he was in Eugene's driveway when he was stopped. (Id.) When he saw Toni standing in front of her driveway, he asked her to let his girlfriend know that the police had him. (Id.) At that point, the Defendant testified, the officer put him in the car, and started asking him about his felony convictions. (Id., at 79). He said he told the officer that he had a felony. (Id.) The Defendant said he saw Toni start walking to his house, then stop and go

8

back. (Id.)

The Defendant then called Brian Carter to identify an aerial photograph of the Charlie Place cul-de-sac. (Id., at 85).

III. Analysis

The Defendant argues that the evidence and statements obtained by the officers as a result of their encounter with him should be suppressed because the detention, seizure and search of his person violated the Fourth Amendment. The Government argues, on the other hand, that the Defendant consented to the pat-down search as part of a consensual encounter with the officers, and the evidence and statements were validly obtained. Alternatively, the Government argues that any detention of the Defendant was justified by reasonable suspicion.

In a recent case, the Sixth Circuit discussed the Fourth Amendment parameters of law enforcement encounters with citizens:

> 'This Court has explained that there are three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." . . .
>
> Although '[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures' by approaching individuals in public places and asking questions, United States v. Drayton, 536 U.S. 194, 200, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), a consensual encounter becomes a seizure when 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). See also Florida v. Bostick, 501 U.S. 429, 434-35, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ('[E]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage-as long as the police do not convey a message that compliance with their request is required.' (citations omitted)); United States v. Peters, 194 F.3d 692, 698 (6th Cir.1999)

9

('Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the [officer's] request for additional identification and voluntarily given information from the defendant does not constitute a seizure under the Fourth Amendment.'). Factors that, if present, indicate that a seizure occurred include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' Mendenhall, 446 U.S. at 554, 100 S.Ct. 1870.

> To justify a brief, investigative stop under Terry v. Ohio, an officer must point to specific, articulable facts that gave rise to a 'reasonable suspicion' that the suspect was engaged in criminal activity. 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). 'A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity."' United States v. Baldwin, 114 Fed.Appx. 675, 679 (6th Cir.2004) (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The officer 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.' United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citations and internal quotation marks omitted).

United States v. Gross, 624 F.3d 309, 314-15 (6th Cir. 2010)(some citations omitted).

As set forth above, the descriptions of the encounter between the Defendant and the officers given by Officer Kahn, Officer Neumeyer, and the Defendant are not consistent. There is no dispute that the officers were appropriately responding to a serious call when they initially entered the cul-de-sac. After that, according to Officer Kahn, he simply approached the Defendant and asked him if he lived nearby and whether he had a weapon on him, and the Defendant responded to those questions. Officer Kahn said he then asked the Defendant for consent to a pat-down search and the Defendant consented. As described by Officer Kahn, the encounter with the Defendant was consensual.

On the other hand, Officer Neumeyer testified that he, not Officer Kahn, was the first to speak to the Defendant. According to Officer Neumeyer, when he got out of his car, he saw the

10

Defendant walking briskly away and acting nervous, and he called out to him: "Hey come here. . . Can I talk to you?" Officer Neumeyer testified that Officer Kahn then engaged the Defendant in conversation.

The Defendant argues that Officer Neumeyer's initial words to him would be interpreted by a reasonable person as a command to stop, and was therefore, a seizure. Under the totality of the circumstances presented here, however, the Court concludes that Officer Neumeyer's words would be interpreted by a reasonable person as simply a normal means used by one individual for attracting the attention of another individual. Officer Neumeyer testified that at the time he made the statement and asked the question, the Defendant was walking quickly away. Officer Neumeyer also testified that he spoke in a normal tone of voice, and did not display his weapon or touch the Defendant when he initially spoke to him. Officer Neumeyer indicated that only he and Officer Kahn were present when he addressed the Defendant (Officer Davis's attention was directed to another individual). Despite the Defendant's suggestion, the evidence does not indicate that the Defendant was "hemmed in" and physically unable to leave, either on foot or by vehicle, at that time.

After this initial statement/question, Officer Neumeyer testified that Officer Kahn addressed the Defendant, asking if he had weapons on him and then asking for consent for a pat-down search, to which the Defendant agreed. The officers indicated that only thirty seconds to two minutes elapsed between the time they exited their cars to the time they discovered the weapon on the Defendant. The Defendant did not contradict this testimony.

Under these circumstances, the Court credits the testimony of Officer Kahn. The Court further concludes that Officer Neumeyer's initial words directed to the Defendant did not

convert the consensual encounter into a seizure. See United States v. Davis, 514 F.3d 596, 609-610 (6th Cir. 2008)(Officer's statement to defendant – "[H]ey, Melvin, come here" followed by "[C]ome here I need to talk to you for a minute" – was a consensual encounter as there was no evidence that his manner was coercive or intimidating); United States v. Broomfield, 417 F.3d 654, 655-56 (7th Cir. 2005)(Officer's statement to defendant to "stop" and "take his hands out of his pockets" did not rise to the level of a seizure as the "interference with personal liberty is too slight to activate constitutional concerns.")

The Defendant argues, however, that the testimony of the officers should not be credited by the Court because it is not consistent, and that the Court should credit his testimony. Under the Defendant's version of events, when the officers called out to him the first time, he kept walking, but stopped when they called out to him a second time to "stop" and "come here." The Defendant testified that he answered the officers' questions about whether he had a weapon on him and about where he lived. The Defendant testified that when the officers asked about a weapon a second time, he denied having one and held up his shirt. At that point, according to the Defendant, one of the officers searched him, without asking for his consent, and found the weapon. The Defendant said the officers were touching their weapons while talking with him.

Although the officers' testimony differed in some respects, the Court is not persuaded that those differences lead to the conclusion that the Defendant was seized, then searched, involuntarily and without consent. As discussed above, the officers' testimony indicates that their initial encounter with the Defendant was voluntary, and both officers testified that the Defendant was asked for consent for a pat-down search, and gave that consent. Having observed the bearing and demeanor of the officers and the Defendant while testifying, the Court is not

persuaded that the Defendant was seized or searched without his consent.

For the reasons set forth above, the Court concludes that the Defendant has not demonstrated a constitutional violation, and the evidence obtained by the officers should not be suppressed. In addition, the Defendant has not shown a separate constitutional violation regarding the Defendant's subsequent statements to law enforcement. Accordingly, the Motion To Suppress is denied.

It is so ORDERED.

                                              _Todd Campbell_
                                              TODD J. CAMPBELL
                                              UNITED STATES DISTRICT JUDGE